# EXHIBIT 1

RECEIVED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

AUG 11 2006

TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

Index No. 06-15030

DEVELOPMENTAL STRATEGIES COMPANY LLC,
PROFIT SHARING PLAN,

Date Filed: Aug. 11, 2006

Plaintiff

- against -

NODINE REALTY CORPORATION, STATE OF NEW
YORK, NEWELL FUNDING, LLC and "John Doe #1"
through "John Doe #10", the last 10 names being
fictitious and unknown to the Plaintiff, the person
or parties intended being the persons or parties, if
any, having or claiming an interest in or lien upon
the mortgaged premises described in the
complaint,

Plaintiff designates
WESTCHESTER County as the
place of trial. Venue is based
upon the County in which the
mortgaged premises is
situated.

Defendants

------------------------------------------------------------------------X

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons,
to serve a notice of appearance on the attorneys for the Plaintiff within 20 days
after the service of this summons, exclusive of the day of service (or within 30
days after service is complete if this summons is not personally delivered to you
within the State of New York). In case of your failure to appear or answer,
judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: August 10, 2006

JOHN T. DOHERTY, ESQ.
ROBINOWITZ COHLAN DUBOW & DOHERTY LLP
Attorneys for Plaintiff
199 Main Street
White Plains, New York 10601

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-------------------------------------------------------------------------------X

Index No. 06 - 15030

DEVELOPMENTAL STRATEGIES COMPANY LLC,
PROFIT SHARING PLAN,

Plaintiff

- against -

NODINE REALTY CORPORATION, STATE OF
NEW YORK, NEWELL FUNDING, LLC and "John
Doe #1" through "John Doe #10", the last 10
names being fictitious and unknown to the
Plaintiff, the person or parties intended being
the persons or parties, if any, having or
claiming an interest in or lien upon the
mortgaged premises described in the
complaint,

Defendants

-------------------------------------------------------------------------------X

**VERIFIED COMPLAINT**
**Mortgage Foreclosure**

**RECEIVED**

AUG 1 1 2006

TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

The Plaintiff, by its attorneys, ROBINOWITZ COHLAN DUBOW & DOHERTY LLP, complaining of the Defendants, alleges that:

1.    The Plaintiff, DEVELOPMENTAL STRATEGIES COMPANY LLC, PROFIT SHARING PLAN (hereinafter "Developmental"), at all times hereinafter mentioned was and still is a Limited liability company duly organized and existing under the laws of the State of New York, having an office at 245 Main Street, Suite 330, White Plains, New York 10601.

2.    The Defendant, NODINE REALTY CORPORATION (hereinafter "Defendant Nodine"), for the purpose of securing the payment to the Plaintiff of the principal sum of $375,000.00 with interest thereon, on or about January 25, 2005, for a valuable consideration, executed and delivered to Plaintiff

Developmental, a Promissory Note dated on that day (the "Note"), whereby said Defendant Nodine undertook and promised to pay the aforesaid principal sum and interest thereon at the rate provided therein. A copy of said Note is attached hereto and made a part hereof.

3. As collateral security for the payment of said indebtedness, Defendant Nodine duly executed, acknowledged and delivered to Developmental a Mortgage dated January 25, 2005 (hereinafter the "Mortgage"), whereby Defendant Nodine mortgaged to Developmental the premises commonly known as 57 North Central Avenue, Hartsdale, New York, and further known as the Town of Greenburgh, County of Westchester, State of New York, Sheet 23, Block 8233, Lot 7, which premises are more fully described in said Mortgage and in Schedule "A" attached hereto and made a part hereof, together with the appurtenances thereto and all fixtures and articles of personal property annexed to or used in connection with the mortgaged premises, as is more fully set forth in the Mortgage. A copy of the Mortgage is attached hereto and made a part hereof.

4. The Mortgage was duly recorded in the Office of the Clerk of the County of Westchester on January 25, 2005 in control number 450490670. The mortgage recording tax due thereon was duly paid in full.

5. The Plaintiff herein is the owner and holder of said Note and Mortgage.

6. Said Mortgage provided that in case of default in the payment of

2

any principal or interest that might become due thereon, the holder of the Mortgage could declare the entire indebtedness secured by the Mortgage immediately due and payable, and the holder of the Mortgage was thereby empowered to sell the mortgaged premises according to law.

8.      The Defendant Nodine  has failed to comply with the terms, covenants and conditions of said Note and Mortgage by defaulting on the payment matured loan amount which became due and payable on January 24, 2006.

9.      By reason of such default, the Plaintiff has duly elected and does hereby elect to declare the entire balance of the principal sum secured by said Note and Mortgage to become immediately due and payable. Further, any applicable notices of default which may be required by the terms of the Note and Mortgage have heretofore been delivered and/or mailed to the Defendant Nodine.

10.     There is now due and owing to the Plaintiff under said Note and Mortgage the sum of THREE HUNDRED SEVENTY FIVE THOUSAND 00/100 ($375,000) DOLLARS for principal due with interest thereon at the rate provided for in said Note.

11.     In order to protect its security, the Plaintiff may be compelled, during the pendency of this action, to pay sums for premiums on insurance policies, real estate taxes, assessments and water rates which are or may become liens on the mortgaged premises, and other charges which may be

3

necessary for the protection of the mortgaged premises, and the Plaintiff prays that any sum or sums so paid, together with interest from the date of payment, shall be added to the Plaintiff's claim and be deemed secured by said Note and Mortgage and adjudged a valid lien on the mortgaged premises, and that the Plaintiff be paid such sums, together with interest thereon, out of the proceeds of the sale of the mortgaged premises.

12.     The Defendant, STATE OF NEW YORK, is made a party defendant herein by virtue of a possible lien for unpaid New York State franchise taxes, which interest, if any, is subject and subordinate to the plaintiff's mortgage sought to be foreclosed herein.

13.     The Defendant, NEWELL FUNDING LLC, is made a party defendant herein by virtue of an alleged mortgage lien in the sum of $2,600,000.00 dated March 24, 2005 and recorded on May 5, 2005 in the Westchester County Clerk's Office, which interest, if any, is subject and subordinate to the plaintiff's mortgage sought to be foreclosed herein.

14.     Upon information and belief, each of the above named Defendants have or claims to have some interest in or lien upon the mortgaged premises or some part thereof, which interest or lien, if any, has accrued subsequent to the lien of said Mortgage and is subject and subordinate thereto.

15.     No other action or proceeding has been had at law or otherwise for the recovery of said sum so secured by said Note and Mortgage, or any part thereof.

4

16.     The mortgaged premises under foreclosure herein will be sold subject to any state of facts an accurate survey would show, and to covenants, restrictions and easements, if any, of record affecting said mortgaged premises and any violations thereof, and to zoning regulations and ordinances of the city, town or village in which said mortgaged premises lies and any violations thereof.

17.     The Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinbefore made by reason of the payment, after the date of the commencement of this action, of any or all of the defaults mentioned herein; and such election shall continue and remain effective until the costs and disbursements of this action, and all present and future defaults under the Note and Mortgage and occurring prior to the discontinuance of this action are fully paid.

18.     The Mortgage provides that, in the case of foreclosure, the mortgaged premises may be sold as one parcel.

19.     The Defendants named "JOHN DOE #1" through "JOHN DOE #10" may be persons or parties in possession of, having or claiming an interest in or lien on the premises.

20.     In the Note and Mortgage hereinbefore described,  the Mortgagor, Defendant Nodine, agreed to pay the reasonable attorneys' fees of the holder of the Mortgage in the event of a default under the Note and Mortgage and the commencement of a suit to foreclose the same.

**WHEREFORE,** the Plaintiff demands judgment that the Defendants and all persons claiming under them or any of them, subsequent to the filing of the notice of pendency of this action, may be barred and foreclosed of all right, title, claim, lien and equity of redemption in the mortgaged premises; that said mortgaged premises may be decreed to be sold in one parcel according to law; that the money arising from the sale may be brought into court; that the Plaintiff may be paid the amount of principal and interest due on said Note and Mortgage as hereinbefore set forth with interest to the time of such payment, and any sums paid by the Plaintiff for real estate taxes, water rates, sewer rents, assessments, insurance premiums and other necessary charges or expenses to protect the lien of the Mortgage, and any sums expended for the protection or preservation of the property covered by said Mortgage, with interest thereon from the time of such payment, and the costs and disbursements of this action, and all other amounts due the Plaintiff under said Note and Mortgage, so far as the amount of such money properly applicable thereto will pay the same; and that the Plaintiff may have such other and further relief in the mortgaged premises as may be just and equitable.

Dated: August 10, 2006

JOHN T. DOHERTY, ESQ.
ROBINOWITZ COHLAN DUBOW & DOHERTY LLP
199 Main Street
White Plains, New York 10601

## SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Greenburgh, County of Westchester and State of New York, being more particularly bounded and described as follows:

BEGINNING at a point on the northwesterly side of Central Park Avenue, said point being distant 689.12 feet easterly as measured along the northwesterly side of Central Park Avenue from the easterly side of Hartsdale Avenue, as widened;

RUNNING THENCE North 45 degrees 20 minutes 30 seconds West, a distance of 45.29 feet to a point;

RUNNING THENCE North 46 degrees 00 minutes 20 seconds West, a distance of 54.71 feet to a point;

RUNNING THENCE North 47 degrees 47 minutes 10 seconds East, a distance of 78.03 feet to a point.

RUNNING THENCE South 46 degrees 00 minutes 20 seconds East, a distance of 54.71 feet to a point;

RUNNING THENCE South 41 degrees 09 minutes 00 seconds East, a distance of 45.29 feet to the northwesterly side of Central Park Avenue;

RUNNING THENCE along the northwesterly side of Central Park Avenue, South 47 degrees 47 minutes 10 seconds West, a distance of 78.03 feet to the point and place of BEGINNING.

SAID PREMISES being known as 57 North Central Avenue, Hartsdale, N.Y.

PROMISSORY NOTE

$375,000.00

White Plains, New York
January 25, 2005

FOR VALUE RECEIVED, NODINE REALTY CORPORATION (the "Borrower"), having an address c/o Food Management Group, 1 Michael Frey Drive, Eastchester, New York 10709 promises to pay to the order of DEVELOPMENT STRATEGIES COMPANY LLC, PROFIT SHARING PLAN, having an address at 245 Main Street, Suite 330, White Plains, New York 10601 (the "Lender"), the principal sum of THREE HUNDRED SEVENTY FIVE THOUSAND and 00/100 ($375,000.00) DOLLARS, or so much thereof remains unpaid, on January 24, 2006 or, if such date is not a New York Working Day (hereinafter defined), on the next following New York Working Day (the "Maturity Date") or such earlier date as may be required under the terms of this Promissory Note (hereinafter the "Note"), together with interest thereon from the date hereof at the Interest Rate (hereinafter defined) on the unpaid balance payable as hereinafter set forth.

## I. INTEREST

A.    COMPUTATION AND PAYMENT. Interest from and after the date hereof on the outstanding principal balance due hereunder shall be computed on the basis of "a 360 day year for the actual number of days elapsed" (such phrase, as used throughout this Note, shall mean that in computing interest for a monthly period, the Interest Rate in effect for each day from and including the date of the preceding interest and/or principal due date, as the case may be, to but excluding the date of the next interest and/or principal due date shall be multiplied by a fraction, the denominator of which is 360 and the numerator of which is the outstanding principal balance of the Loan, and the interest for each day in the monthly period as so computed shall be aggregated to determine the interest due for such monthly period and shall be payable monthly in arrears commencing on February 1, 2005, and on the first day of each and every month thereafter, or if any such day is not a New York Working Day, on the next following New York Working Day (such date for any particular monthly period being hereinafter referred to as the "Due Date") until the Maturity Date.

B.    DEFINITIONS. As used herein:

(1)    "Maturity Date" shall mean   January 24, 2006.

(2)    "Interest Rate" shall mean the per annum rate of interest to be paid by Borrower on any outstanding principal due under this Note, and from the date hereof up to and including the

Maturity Date which shall be at the rate of fifteen (15%) percent per annum, provided that there is no default in which case the default rate of interest shall prevail.

(3)     "Working Day" shall mean any day other than a Saturday, a Sunday or a day on which commercial banks in New York City are required or authorized to be closed.

## II.  PREPAYMENT.

A.     This Loan may be prepaid in whole prior to June 25, 2005 provided that Borrower pays all sums which, but for the prepayment would become due hereunder through such date. Thereafter, the Loan may be prepaid in whole upon five (5) days' notice to Lender, subject to the provisions of subparagraph B below.

B.     If Borrower repays the Loan in whole on or after June 25, 2005, the Borrower shall pay the outstanding principal balance then due, together with any unpaid accrued interest and late charges or other amounts owing by Borrower to Lender to date of receipt by Lender.

## III.  MISCELLANEOUS

A.     MAXIMUM PERMISSIBLE RATE.     It is the intention of the parties to conform strictly to the usury laws, whether state or federal, that are applicable to the Loan. All agreements between Borrower and Lender, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid to Lender, or collected by Lender, for the use, forbearance or detention of the money to be loaned hereunder or otherwise, or for the payment or performance of any covenant or obligation contained herein or in any of the other loan documents executed in connection with the Loan (collectively, the "Loan Documents") exceed the maximum amount permissible under applicable federal or state usury laws. If under any circumstances whatsoever fulfillment of any provision hereof or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the limit of validity prescribed by law, then the obligation to be fulfilled shall be reduced to the limit of such validity; and if under any circumstances Lender shall ever receive an amount deemed interest by applicable law, which would exceed the highest lawful rate, such amount that would be excessive interest under applicable usury laws shall be applied to the reduction of the principal amount owing hereunder or to other indebtedness secured by any mortgage and/or the other Loan Documents and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal and such other indebtedness, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Borrower or to any other person making such payment on Borrower's behalf. All sums

paid or agreed to be paid to the Lender for the use, forbearance or detention of the indebtedness of Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by applicable law, and to the extent necessary to preclude exceeding the limit of validity prescribed by law, be amortized, prorated, allocated and spread from the date of disbursement of the proceeds of the Loan until payment in full of the Loan so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof and thereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Borrower and Lender and any endorser, guarantor or indemnitor.

B.    SECURED NOTE.  This Note is secured by a mortgage (the "Mortgage") on the property owned by the Borrower at 57 North Central Avenue, Hartsdale, New York (the "Premises"), to which reference is made to the Mortgage for a complete description of the property mortgaged and pledged.  All of the terms, covenants, conditions and agreements of the Mortgage are hereby made a part of this instrument to the same extent and with the same force and effect as if fully set forth herein.

C.    SET-OFF. The Lender shall have a continuing lien and/or right of set-off on, and is hereby granted a security interest in, all deposits (general and special) and credits of the Borrower with the Lender, and upon an Event of Default under the Agreement may apply all or part of the same to any obligations (whether contingent or unmatured) of the Borrower under this Note and under any other obligations of Borrower to Lender, at any time or times, without notice. The Lender shall have a continuing lien on, and is hereby granted a security interest in, all property of every kind of the Borrower and the proceeds thereof held or received by or for the Lender for any purpose, whether or not for the express purpose of serving as collateral security for the obligations of the Borrower. As used in this Note, the term "Lender Affiliate" includes any individual, partnership or corporation acting as nominee or agent for the Lender, and any corporation or Lender which is directly or indirectly owned or controlled by, or under common control with, the Lender. Any notice of disposition of property shall be deemed reasonable if mailed at least five (5) days before such disposition to the last address of the Borrower on the Lender's records. If the obligations of the Borrower to the Lender evidenced by this Note are secured by a security agreement and/or other security documents which the Borrower has separately delivered to the Lender, reference to such documents is made for a description of the collateral provided thereby and of the rights of the Borrower and the Lender therein. The rights and remedies of the Lender provided for hereunder (including, but not limited to the right to accelerate the obligations of the Borrower and to realize on any security for any such obligations) are cumulative with the rights and remedies of the Lender available under any other instrument or agreement or under applicable law. As used in this Note, the term "obligations" of a person means all amounts payable under this Note and any and all other indebtedness, obligations and liabilities of that person to the Lender, and all claims of the Lender

against such person, now existing or hereafter arising, direct or indirect (including participations or any interest of the Lender in indebtedness of such person to others), acquired outright, conditionally, or as collateral security from another, absolute or contingent, joint or several, secured or unsecured, matured or unmatured, monetary or nonmonetary, arising out of contract or tort, liquidated or unliquidated, arising by operation of law or otherwise, and all extensions, renewals, refinancings, replacements and modifications of any of the foregoing. "Person" means any individual, partnership, limited partnership, corporation, association, trust or other entity.

D.    VENUE AND JURISDICTION. The Borrower agrees that any action, suit or proceeding in respect of or arising out of this note my be initiated and prosecuted in the state or federal courts, as the case may be, located in Westchester County, New York . The Borrower consents to and submits to the exercise of jurisdiction over its person by any such court having jurisdiction over the subject matter.

E.    WAIVER OF DEFENSES. In any action or proceeding in connection with this Note, the Borrower waives any claim that New York is an inconvenient forum and further waives the right to interpose any defense based upon any statute of limitations or any claim of laches and any set-off or counterclaim of any nature or description except for any counterclaims deemed compulsory under applicable court rules or statutes.

F.    WAIVER OF TRIAL BY JURY. In any action or proceeding in connection with this Note, the Lender and Borrower mutually waive, to the fullest extent permitted by law, trial by jury and Borrower hereby waives, to the fullest extent permitted by law, any claim for consequential, punitive or special damages.

G.    BORROWER'S AUTHORITY. To induce the Lender, in its sole discretion, to make the loan to the Borrower, the Borrower represents, warrants and covenants to the Lender that (i) the Borrower is duly incorporated and validly existing in good standing under the laws of the jurisdiction of its organization, with full power and authority to make, deliver and perform this Note; (ii) the execution, delivery and performance by the Borrower of this Note has been duly authorized by all necessary corporate action or with partnership consent, as the case may be, and does not and will not violate or conflict with its charter or by-laws or partnership agreement or any law, rule, regulation or order binding on the Borrower or any agreement or instrument to which the Borrower is a party or which may be binding on the Borrower; (iii) this Note has been fully executed by an authorized officer or partner of the Borrower and constitutes a legal, valid, binding and enforceable obligation of the Borrower; (iv) no authorization, consent, approval, license, exemption of or filing or registration with, any court or government or governmental agency is or will be necessary to the valid execution, delivery or performance by the Borrower of this Note; (v) there are no pending or

threatened actions, suits or proceedings against or affecting the Borrower by or before any court, commission, bureau or other governmental agency or instrumentality, which, individually or in the aggregate, if determined adversely to the Borrower, would have a material adverse effect on the business, properties, operations, or condition, financial or otherwise, of the Borrower; and (vii) the most recent financial statements of the Borrower heretofore delivered to the Lender are complete and correct and since the date thereof there has not occurred any material adverse change in the financial condition or operations of the Borrower from that shown on said financial statements.

H.   ATTORNEY FEES. In case any principal of or interest on this Note is not paid when due, Borrower shall be liable for all costs of enforcement and collection of this Note incurred by the Lender or any other holder of this Note, including, but not limited to reasonable attorneys' fees, disbursements and court costs. In addition, in the event of a default hereunder, the Borrower shall pay all reasonable attorneys' fees and disbursements incurred by the Lender in obtaining advice as to its rights and remedies in connection with such default.

I.   WAIVER. All parties hereto, whether Borrower, principal, surety, guarantor or endorser, waive demand, notice of demand, protest and notice of protest, and any or all other notices or demands (other than demand for payment) in connection with the delivery, acceptance, performance, default of this Note. The liability of the Borrower hereunder shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the holder hereof, including, but not limited to any extension of time, renewal, waiver or other modification. Any failure of the holder to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any time and from time to time thereafter. The Lender or any holder may accept late payments, or partial payments, even though marked "payment in full" or containing words of similar import or other conditions, without waiving any of its rights. No amendment, modification or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. This Note cannot be changed or terminated orally or by estoppel or waiver or by any alleged oral modification regardless of any claimed partial performance referable thereto.

J.   EVENT OF DEFAULT: DEFAULT RATE. This Note and all sums outstanding or accrued hereunder, whether or not then due and owing shall, at the option of the Lender, exercisable in its sole and arbitrary discretion, be immediately due and payable upon the failure of the Borrower to make payments of principal and interest or other amounts required hereunder within five (5) days after the due date thereof or upon the occurrence of an Event of Default under the Agreement or any default under the Mortgage securing the Note or any default under any of the other loan documents,

after the expiration of any applicable grace, notice or cure period. If this Note is not paid in full upon the Maturity Date or such earlier date upon which the principal balance shall become due and payable, whether by acceleration or Lender is otherwise entitled to accelerate the Loan whether formal notice has been given or not, then the Borrower shall pay to the Lender in addition to all other sums due hereunder, a prepayment fee (the "Prepayment Charge") equal to six (6%) percent of the outstanding principal balance due under this note as liquidated damages and not as a penalty. From and after such date, the Borrower shall pay the Lender interest at a default rate equal to the lesser of twenty-four (24%) percent per annum or the maximum rate permitted by law on all sums outstanding hereunder, until such indebtedness is satisfied; nothing contained herein shall be deemed to extend the maturity of the indebtedness.

K.    COLLECTION FEES. Should the indebtedness evidenced hereby or any part thereof be collected at law or in equity, or in bankruptcy, receivership or any other court proceeding (whether at the Trial or Appellate level), or should this Note be placed in the hands of attorneys for collection upon default, the Borrower agrees to pay, in addition to the principal, any late payment charge and interest due and payable hereunder, all costs of collecting or attempting to collect such indebtedness, including reasonable attorneys' fees and expenses.

L.    LATE CHARGE. If any payment shall be accepted more than five (5) days after the date when due, the Lender may impose a late charge of six ($ .06) cents for each dollar paid late to cover the Lender's additional costs to administer the loan represented hereby due to such late payment. In addition, if a check is delivered to Lender is dishonored, a fee in the amount of $250.00 shall be paid by Borrower to Lender and if Lender is required to send a notice to Borrower, Borrower shall pay Lender the sum of $150.00 per notice.

M.    GOVERNING LAW. This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.

N.    NOTICES. All notices to be given hereunder shall be delivered by hand or sent to the party to be notified via a nationally recognized overnight carrier service (e.g. Federal Express), and shall be deemed given when delivered by hand or one (1) day after delivered to such carrier addressed to the parties at the above addresses. Lender also may send any notice by email to Borrower at _____.

O.    ADDRESS FOR PAYMENTS. Both principal and interest on this Note and late payment charges, as well as any additional payments required by the Mortgage shall be payable to lender at the above address or such other place as each holder hereof may designate in writing, in lawful money of the United States of America.

P.     <u>SUCCESSORS AND ASSIGNS</u>. This Note shall be binding upon the Borrower and its successors and permitted assigns.

Q.     <u>INVALID TERMS</u>. Should any term, provision, covenant or condition of this Note be held to be void or invalid, the same shall not affect any other term, provision, covenant or condition, but the remainder hereof shall be effective as though such void or invalid term, provision, covenant or condition had not been contained herein.

R.     <u>NO ORAL MODIFICATIONS</u>. This Note may not be changed or terminated orally.

S.     <u>HEADINGS AND CAPTIONS</u>. The headings and captions of the numbered paragraphs of this Note are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

T.     <u>JOINT AND SEVERAL LIABILITY</u>. If this Note is executed by more than one person or entity, all representations, warranties, obligations and covenants made by the Borrower hereunder shall be deemed to have been made by each of such persons and entities and the obligations and duties of such parties hereunder shall be deemed to be joint and several in all respects.

U.     <u>COMMERCIAL TRANSACTION.</u> Borrower represents that this transaction is a commercial transaction and not for consumer purposes and Borrower acknowledges that this is a material inducement for the Lender making this Loan and waives any defense that he might have with regard to the terms of this Loan not being commercially reasonable

V.     <u>RETURNED CHECKS</u>. In the event that the Borrower tenders any payment by check and said check is dishonored or returned for any reason, then Lender may, without waiving any of its rights hereunder, demand all future payments be made by wire transfer to an account designated by Lender or bank or certified checks.

IN WITNESS WHEREOF, the undersigned has executed the foregoing instrument as of the day and year first above written.

Borrower:     NODINE REALTY CORPORATION.

By:     _____

Name: ANASTASIOS GIANOPOULIS
Title: President

NODINE REALTY CORPORATION,

Mortgagor,

and

DEVELOPMENT STRATEGIES COMPANY LLC, PROFIT SHARING PLAN,

Mortgagee.

$ 375,000.00

MORTGAGE AND SECURITY AGREEMENT

Dated:  As of January 25, 2005

This instrument affects real and personal property situated in the Town of Greenburgh and State of New York, designated as Sheet 23, Block 8233, Lot 7 on the Tax Map of the Town of Greenburgh; County of Westchester.

Record and Return to:

Rothschild & Pearl, LLP
245 Main Street
Suite 330
White Plains, New York 10601
Attn:   Alan H. Rothschild, Esq.

Title Co.

Stewart Title Insurance Company
707 Westchester Avenue
White Plains, New York 10604

Title No.: 05-26365-W

## MORTGAGE AND SECURITY AGREEMENT

MORTGAGE AND SECURITY AGREEMENT, dated as of 25th day of January 2005, between DEVELOPMENT STRATEGIES COMPANY LLC, PROFIT SHARING PLAN, having an office at 245 Main Street, White Plains, New York 10601 (Mortgagee), and NODINE REALTY CORPORATION, a New York Corporation, having an address at 57 North Central Avene, Hartsdale, New York (Mortgagor)

### W I T N E S E T H:

WHEREAS, Mortgagor is the fee owner of the land and improvements thereon generally known as and by the street address 57 North Central Avenue, Hartsdale, New York as more particularly described on Schedule A annexed hereto and made a part hereof; and

TO SECURE, (a) the full, faithful and punctual (i) payment by Mortgagor of Three Hundred Seventy Five Thousand ($375,000.00) dollars and sums payable under the Note, or any other Loan Document (as hereinafter defined) and (ii) performance of and compliance with each and every term, condition, undertaking, covenant and provision to be performed or complied with by Mortgagor pursuant to the Loan Documents (as hereinafter defined), and (b) the truth, accuracy and completeness of all representations and warranties made by Mortgagor to Mortgagee in the Loan Documents or otherwise in connection with the Loan (as hereinafter defined), Mortgagor hereby creates in favor of Mortgagee a security interest in, and mortgages, grants, assigns, transfers and sets over to Mortgagee, its successors and assigns all of Mortgagor's estate, right, title, interest, claim and demand (whether at law or in equity, in possession or expectancy) in, to and under the following described property (collectively, the "Mortgaged Property"), whether now owned or held or hereafter acquired by Mortgagor:

(i)     the premises described in Schedule A, including all easements, rights, privileges and appurtenances that in any way belong or appertain to such premises, and all estate, right, title, interest, claim or demand whatsoever of Mortgagor therein and in the streets and ways adjacent thereto, whether in law or in equity, in possession or expectancy, now or hereafter acquired, together with any and all options held by Mortgagor to purchase, lease, or sublease or otherwise acquire such premises or any portion thereof or interest therein, and any greater estate in such premises now owned or hereafter acquired by Mortgagor (collectively, the "Premises");

(ii)     all structures, buildings and other improvements now or hereafter located upon the Premises or on any part thereof, including all plant, equipment, apparatus, machinery and fixtures forming part of said structures, buildings and other improvements (all, collectively, the "Improvements");

(iii)     all fixtures, fittings, furniture, furnishings, appliances, apparatus, equipment, machinery and other articles of personal property (including without limitation all building service equipment and building materials and supplies), other than those owned by lessees, now or at any time hereafter attached to, placed upon, or used or

-2-

to be used in any way in connection with the use, enjoyment, occupancy or operation of the Premises or the Improvements (collectively, the "Chattels");

(iv)    all leases, subleases, tenancies, subtenancies and rental and occupancy agreements for the use and occupancy of all or any portion of the Mortgaged Property which are now in existence or which may exist at any time during the period that this Mortgage is in effect, together with any modifications, amendments, renewals or extensions of any of the foregoing, whether or not written and, if written, whether or not recorded (all of which present and future leases, subleases, tenancies, subtenancies and rental and occupancy agreements, as modified, amended, renewed or extended, are hereinafter referred to, each as a "Lease" and, collectively, as the "Leases"), and all estate, right, title, interest, claim and demand of Mortgagor under the Leases, including, without limitation, any cash or securities deposited by lessees or others to secure their performance, the rents and all other sums payable there under and the right to receive and collect the rents, revenues, receipts, income, earnings, issues, accounts receivable and profits derived from the Mortgaged Property (collectively, the "Rents") (subject, however, to any license to collect the Rents granted by Mortgagee to Mortgagor in the Assignment of Leases and Rents (the "Lease Assignment") executed in connection with the Loan), and all guarantees of the performance of lessees and other obligors under such leases and other agreements and instruments;

(v)    all Authorizations (as hereinafter defined), agreements, franchises, applications, and other authorizations relating to the use, occupation, development, subdivision or operation of the Mortgaged Property or any business or activity conducted by or on behalf of Mortgagor on the Mortgaged Property, including, without limitation, all trade names and other names under or by which the Mortgaged Property or any of the Improvements may at any time be operated or known and all rights to conduct business under any such names or any variant thereof, and all trademarks, good will, operating agreements, contract rights, service rights, accounts receivable, books and records and general intangibles (as such term is defined in the Uniform Commercial Code in effect in the state where the Premises are situated (as same may hereafter be amended from time to time, the "Uniform Commercial Code")) now owned or hereafter acquired, in any way relating to the Mortgaged Property;

(vi)    all shares of stock or other evidence of ownership of any part of the Mortgaged Property that is owned by Mortgagor in common with others and all rights of Mortgagor in any owners' or members' association or similar group having responsibility for managing or operating any part of the Mortgaged Property;

(vii)    all present and future insurance policies now or hereafter in effect insuring the Mortgaged Property or any portion thereof or any Rents derived therefrom, and any unearned premiums therefor accrued or to be accrued and all proceeds payable thereunder, together with all moneys now or hereafter on deposit for the payment of premiums in respect of such policies and Impositions (as defined in Section 1.7(a)), and all refunds of real estate taxes and assessments;

-3-

(viii) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards, judgments, awards of damages and settlements made as a result or in lieu of any condemnation, together with all claims, demands, causes of action and recoveries for any loss or diminution in value of any of the foregoing;

(ix) all warranties, guarantees, plans and specifications, shop and working drawings, soil tests and other environmental site tests and all other documents and materials (of any and every kind and nature) now or hereafter existing in respect of the Mortgaged Property;

(x) all betterments, renewals, extensions and replacements of, all substitutions for, and all additions, accessions and appurtenances to, the Mortgaged Property, hereafter acquired by or released to Mortgagor or constructed, assembled or placed by or for Mortgagor at, on or beneath the Premises or attached to the Premises or the Mortgaged Property, as more particularly provided in Section 1.6 of this Mortgage; and

(xi) all claims (of any and every kind and nature) relating to the foregoing components of the Mortgaged Property.

TO HAVE AND TO HOLD unto Mortgagee, its successors and assigns forever. Mortgagor and Mortgagee further agree as follows:

## CERTAIN DEFINITIONS

Unless the context otherwise specifies or requires, each term specified below shall have the meaning ascribed to it below.

"Authorizations" (each, an "Authorization") means all permits, certificates, approvals, consents, licenses and authorizations (including, without limitation, Environmental Authorizations) required to be obtained from Governmental Authorities (as hereinafter defined) in order that the Mortgaged Property shall be owned, used, operated and maintained, and that Mortgagor's business thereat shall be conducted, in accordance with pertinent Requirements (as hereinafter defined).

"Environmental Authorizations" means all Authorizations that pertain to health, Hazardous Substances (as hereinafter defined) or environmental or ecological conditions at, on, under or about the Mortgaged Property.

"Environmental Conditions" (each, an "Environmental Condition") means all conditions relating to Hazardous Substances present at or emanating from the Mortgaged Property, including, without limitation, the past, present or future Release (as hereinafter defined) of Hazardous Substances and their presence in the environment. This term also includes the residual contamination of equipment and/or facilities and off-site treatment, recycling, reclamation, transportation, storage, handling or disposal of Hazardous Substances from the Mortgaged Property.

"Environmental Laws" (each, an "Environmental Law") means all Requirements pertaining to health, Hazardous Substances or environmental or ecological conditions at, on, under or about the Mortgaged Property.

"Event of Default" is defined in Section 2.1.

"Governmental Authority" (collectively, "Governmental Authorities" means the United States of America, the state and city, town or other municipality in which the Premises are situated, any agency, court, department, commission, board, bureau, instrumentality or political subdivision of any of the foregoing, and any arbitration panel or tribunal, in each instance now existing or hereafter created, having or claiming jurisdiction over Mortgagor, the Mortgaged Property or the use, occupancy, operation or condition of the Mortgaged Property or any portion thereof.

"Hazardous Substances" (each, a "Hazardous Substance") means (i) asbestos and asbestos-containing materials, radon, polychlorinated biphenyls, formaldehyde, flammable explosives, radioactive materials, petroleum and products containing or derived from petroleum, underground storage tanks and other underground storage facilities (i.e., any tank or facility and related piping system of which ten percent (10%) or more by volume is underground), (ii) any and all materials, substances, pollutants, contaminants and wastes subject to, or defined as "hazardous substances", "hazardous waste", "hazardous material", "hazardous air pollutant", or "petroleum products" under, any Environmental Law, and (iii) any and all other hazardous or toxic materials, substances, pollutants, contaminants and wastes, including toxic molds.

"Involuntary Rate" means from time to time the lesser of 24% per annum or the maximum rate (if any) that Mortgagee may legally charge at the time.

"Loan" means Mortgagee's loan made to Mortgagor the same day as this Mortgage, in an amount equal to the principal amount of the Note.

"Loan Documents" (each, a "Loan Document") means, collectively, this Mortgage, the Note, the Lease Assignment, any guaranty(ies) executed in connection with the Loan and all other instruments delivered (whether now or hereafter and whether by Mortgagor or any other person) to the holder of the Note in connection with this Mortgage and the Loan.

"Loan Maturity Date" means January 24, 2006.

"Note" means the Promissory Note dated the same day as this Mortgage executed by Mortgagor in favor of Mortgagee in the amount of $375,000.00 together with any and all amendments, extensions, renewals, modifications, refinancings and increases in the amount of, and substitutions for, same.

"Notices" (each, a "Notice") means: (i) citizen or governmental notices of intent to sue under an Environmental Law or common law cause of action; (ii) requests for information under the authority of an Environmental Law; (iii) notices of administrative actions or orders seeking penalties, fines, or remedial activity under any Environmental Law; (iv) any "potentially responsible party" letters under the Comprehensive Environmental Response, Compensation and Liability Act,

42 U.S.C. "6902 et seq. ("CERCLA"); (v) judicial complaints; (vi) notices of administrative or judicial enforcement actions related to any Environmental Law; (vii) notices of violation related to any Environmental Law received by any Principal of Mortgagor or any Guarantor, or (viii) any notice of formal or informal investigation by any agency, or any consent order, whether proposed or final.

"Prepayment Charge" means the Prepayment Charge provided for in the Note, if any.

"Principal(s) of Mortgagor" means, Anastasios Gianopoulis and Constantine Gianopoulis.

"Requirements" (each, a "Requirement") means all laws, statutes, regulations, ordinances, codes, rules, rulings, directives, determinations, judgments, decrees, orders, injunctions, arbitral decisions, Authorizations, Environmental Laws and other requirements of every Governmental Authority now or hereafter in effect (including any of the foregoing that heretofore have been promulgated but which are not yet in effect), in each instance as modified, amended, renewed and/or extended, which are applicable to Mortgagor, to the Mortgaged Property or any portion thereof, to the use, manner of use, occupancy, possession, condition, operation, maintenance, alteration, repair, replacement, or restoration of the Mortgaged Property or any portion thereof or to the conduct of Mortgagor's business at the Mortgaged Property.

"To the best of Mortgagor's knowledge" means, with respect to any representation, warranty or certification contained in this Mortgage as to which such phrase is expressly applied, that, after due inquiry, Mortgagor knows of no fact(s) and has received no communication(s), oral or written, which would cause a reasonably prudent person in the position of Mortgagor to refrain from making the representation, warranty or certification in question.

ARTICLE 1

Mortgagor's Covenants

Mortgagor covenants and agrees for the benefit of Mortgagee as follows:

1.1.    Title. This Mortgage is and shall remain a valid and enforceable first lien on the Mortgaged Property, subject solely to the exceptions referred to in Section 3.1. At Mortgagor's sole cost and expense, Mortgagor shall defend and fully protect and preserve such title and the validity and priority of the lien of this Mortgage against the claims of all other persons and entities.

1.2.    Security Agreement. This Mortgage shall constitute a security agreement with respect to such components of the Mortgaged Property as to which a security interest may attach under the Uniform Commercial Code and, with respect to such of the Chattels as at any time may be fixtures, a fixture filing under the Uniform Commercial Code. The Mortgaged Property consists of both real and personal property. The filing of UCC-1 financing statements ("UCC-1's") in the records customarily pertaining to personal property shall not be construed as in any way derogating from the intention of the parties hereto that all Chattels and other property used in connection with the production of Rents or which are referred to in this Mortgage are, and at all times and for all purposes and in all proceedings, both legal and equitable, shall be, regarded as real estate whether or

-6-

not (a) any such item is physically attached to the Premises or any of the Improvements, (b) serial numbers are used for the better identification of certain of the Chattels capable of being thus identified in a recital contained herein or (c) any such item is referred to in any UCC-1 so filed at any time. Similarly, the mention in the UCC-1's of (x) the rights in the proceeds of any fire and/or hazard insurance policy, (y) any award in condemnation or eminent domain proceedings for a taking or for loss of value, or (z) the debtor's interest as lessor in any present or future Lease or rights to income growing out of the use or occupancy of the Mortgaged Property, whether pursuant to a Lease or otherwise, shall never be construed as in any way derogating from, or altering, any of the rights of Mortgagee set forth in this Mortgage or impugning the priority of Mortgagee's lien granted hereby or by any other recorded instrument, but such mention in the UCC-1's is declared to be for the protection of Mortgagee in the event any court or judge shall at any time hold with respect to (x), (y) or (z) above that notice of Mortgagee's priority of interest, to be effective against a particular class of persons, must be filed in the Uniform Commercial Code records. The addresses of Mortgagor (Debtor) and Mortgagee (Secured Party) are set forth on page 1 of this Mortgage. This Mortgage is to be filed for record with the recorder of deeds of the county or counties in which the Premises are situated. Mortgagor is the record owner of the Mortgaged Property.

    1.3.   Recordation; Certain Costs and Expenses.

        (a) Recording and Filing. Upon the execution and delivery of this Mortgage, and thereafter from time to time, whether or not Mortgagee so demands, Mortgagor, at Mortgagor's sole cost and expense, shall cause this Mortgage and any other instrument creating or evidencing Mortgagee's lien upon, or security interest in, the Mortgaged Property and each Document of Further Assurance (as defined in Section 1.26) to be filed, registered or recorded, as the case may be, in such manner and in such places as may be required by any Requirement in order to publish notice of, and fully to protect and preserve, the liens and security interests created by and granted pursuant to this Mortgage with respect to the Mortgaged Property.

        (b) Fees and Costs of Mortgage, Related Documents. Mortgagor shall punctually pay in strict compliance with applicable Requirements (i) all filing, registration or recording fees with respect to, and all other expenses incident to, the execution, acknowledgment and filing, registration or recording of this Mortgage, any amendment, extension, renewal or modification hereof, any mortgage supplemental hereto, any other security instrument with respect to the Mortgaged Property, any Document of Further Assurance, and any other Loan Document, and (ii) all stamp taxes and other taxes, duties, assessments and charges imposed by Governmental Authorities arising out of or in connection with the execution, delivery, filing, registration, or recording of any of the foregoing.

    1.4.   Obligation to Pay. Mortgagor shall punctually pay in strict compliance with the Loan Documents (a) the principal, interest, Prepayment Charge and all other sums evidenced by the Note and (b) all other moneys, indebtedness, obligations and liabilities (of any and every kind or nature) now or hereafter owing (whether to Mortgagee, any Governmental Authority or any other third party) pursuant to any one or more of the Loan Documents. All of the foregoing shall be deemed to be indebtedness secured by this Mortgage and shall be paid without any abatement, credit, reduction, deduction, claim, counterclaim, set-off or offset whatsoever, and free and clear of all defenses.

1.5.    Compliance with Requirements.

(a)Legal Requirements.  Mortgagor shall fully, faithfully and punctually comply (and shall cause all lessees and other persons and entities that occupy or enter upon the Mortgaged Property at all times so to comply) with all applicable Requirements, including, without limitation, Requirements that, if violated, would cause the Mortgaged Property or a part thereof to be subject to forfeiture. Mortgagor, if a corporation, partnership, trust, limited liability company, limited liability partnership or other legal entity, shall do all things necessary to preserve and keep in full force and effect in all jurisdictions where the same presently are in force and effect Mortgagor's existence, franchises, rights and privileges.

(b)Insurance Policy Requirements.  Mortgagor shall fully, faithfully and punctually comply (and shall cause all lessees and other persons and entities that occupy or enter upon the Mortgaged Property so to comply) with all provisions of all insurance policies covering or applicable to any portion of the Mortgaged Property, all requirements of the issuer of any such policies and all orders, rules, regulations, directives, codes and other requirements of the National Board of Fire Underwriters (or any successor body or other body performing similar functions) applicable to Mortgagor, to the Mortgaged Property or to the use, manner of use, occupancy, possession, operation, maintenance, alteration or repair of the Mortgaged Property or any portion thereof, except that Mortgagor shall not effect any such compliance that necessitates structural changes to any of the Improvements without the prior written consent of Mortgagee.

1.6.    Scope of Security.  All right, title and interest of Mortgagor in and to all betterments, renewals, extensions and replacements of, all substitutions for, and all additions, accessions and appurtenances to, the Mortgaged Property, hereafter acquired by, or released to, Mortgagor or constructed, assembled or placed by or for Mortgagor at, on or beneath the Premises or attached to the Improvements, and all conversions of any of the foregoing, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, without any further mortgage, conveyance, assignment or other act of Mortgagor, shall become subject to the liens and security interests created by or pursuant to this Mortgage as fully and completely, and with the same effect, as if now owned by Mortgagor and specifically described herein. Mortgagor shall, however, execute and deliver to Mortgagee any and all such further assurances, mortgages, conveyances or assignments thereof as Mortgagee may reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Mortgage.

1.7.    Payment of Impositions for Mortgaged Property.

(a)Taxes, Charges, Etc.  Except to the extent that Mortgagee exercises the right specified in Section 1.11, Mortgagor shall, at least ten days before the applicable due date, pay and discharge all taxes and other charges of every kind and nature imposed upon or assessed against Mortgagor or the Mortgaged Property or any portion thereof or upon the Rents derived therefrom or arising in respect of the occupancy, use, possession or transfer thereof, including, without limitation, real estate, school, personal property, income, gross receipts and franchise taxes; water, water meter and sewer rents, rates and charges; service charges with respect to police protection, fire protection,

-8-

street and highway construction, maintenance and lighting, sanitation and water supply; assessments and levies; permit, inspection and license fees; and all other public and private charges, general and special, ordinary and extraordinary, foreseen and unforeseen, together with all interest, fines and penalties applicable thereto (each of the foregoing, an "Imposition" and, collectively, "Impositions"). Mortgagor shall, upon Mortgagee's request, promptly deliver to Mortgagee documentation reasonably satisfactory to Mortgagee evidencing such payments.

(b) Liens and Claims. Mortgagor shall promptly pay all lawful claims and demands of mechanics, materialmen, laborers and others that, if not timely paid, might result in, or permit the creation of, a lien, other encumbrance or charge on the Mortgaged Property or any part thereof, or on the Rents derived therefrom, or lead to the interruption or suspension of any business of Mortgagor. Mortgagor shall, upon Mortgagee's request, promptly deliver to Mortgagee evidence reasonably satisfactory to Mortgagee of any such payment. Mortgagor shall not create or permit to be created any mortgage, lien, other encumbrance or charge on the Mortgaged Property or any part thereof or on the interest of Mortgagor or Mortgagee therein other than this Mortgage and promptly shall cause any such mortgage, lien, other encumbrance or charge to be discharged, bonded or otherwise secured to Mortgagee's satisfaction.

(c) Mortgagor's Right to Contest. Mortgagor, in good faith and at Mortgagor's sole cost and expense and after Mortgagee shall have received written notice thereof from Mortgagor, may contest the amount or the validity of any Imposition by appropriate legal proceedings, provided that (i) Mortgagor shall prosecute such proceedings diligently; (ii) no Event of Default shall exist during the pendency of any such proceedings; (iii) such proceedings shall operate to suspend the collection of any such Imposition or other realization thereon and neither the Mortgaged Property nor any part thereof nor interest therein nor any of the Rents derived therefrom would, by reason of such suspension, be forfeited or lost, or subjected to any lien, other encumbrance or charge and neither Mortgagor nor Mortgagee would, by reason thereof, be subject to civil or criminal liability; (iv) during such contest Mortgagor shall, at the option of Mortgagee, provide security satisfactory to Mortgagee assuring the payment of the contested Imposition and of any additional charge, fine, penalty or expense arising from or incurred as a result of such contest and any costs or expenses incurred or to be incurred by Mortgagee in connection with or as a consequence of Mortgagor's contest; and (v) if at any time nonpayment of any Imposition would result in the delivery of a tax deed or similar instrument to the Mortgaged Property or any portion thereof or any forfeiture with respect to the Mortgaged Property, then Mortgagor shall pay such Imposition (together with all applicable fines, penalties and other governmental charges and any interest or costs with respect thereto) in time to prevent the delivery of such deed or instrument or the effectuation of such forfeiture.

1.8.    Indemnity by Mortgagor. Mortgagor shall defend and indemnify Mortgagee and all directors, officers, shareholders, employees, attorneys and agents of Mortgagee (collectively, the "Indemnified Parties") against, and save the Indemnified Parties harmless from, and shall reimburse the Indemnified Parties with respect to, any and all claims, demands, actions, causes of action, injuries, orders, losses, liabilities (statutory or otherwise), obligations, damages (including, without limitation, consequential damages), fines, penalties, taxes, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by, imposed upon or asserted against the Indemnified Parties or any one or more of them by reason of, or in connection with, (a)

Mortgagee's interest in any Loan Document or the Mortgaged Property, (b) any misrepresentation or other incorrect statement or certification by Mortgagor, any Principal of Mortgagor or any Guarantor contained in this Mortgage or any other Loan Document, (c) any failure by Mortgagor to comply with any of the terms, conditions or other provisions set forth in this Mortgage or any other Loan Document or in any recorded instrument that affects the Mortgaged Property, (d) any acts or omissions of Mortgagee in connection with the exercise by Mortgagee of any right, power or remedy available to Mortgagee under this Mortgage or any other Loan Document, (e) any use, non-use, possession, occupancy, alteration, repair, condition (whether patent or latent), operation, maintenance or management of the Mortgaged Property or any portion thereof, or (f) any accident, injury (including death at any time resulting therefrom) or damage to any person or property occurring in, on or about the Mortgaged Property or any portion thereof, whether resulting from any act or omission of Mortgagor or any agent, employee, contractor, lessee, sublessee, licensee or invitee of Mortgagor or otherwise. Mortgagor shall pay, and save Mortgagee harmless from, any taxes, impositions, charges, assessments or levies except income taxes imposed on Mortgagee by reason of Mortgagee's ownership of the Note or this Mortgage or any other Loan Document or by reason of a sale or other transfer of the Mortgaged Property or any portion thereof. All amounts payable to Mortgagee under this Section 1.8 shall be payable upon demand by Mortgagee, together with interest at the Involuntary Rate from the date of such demand until the date of receipt by Mortgagee of full payment, and shall be secured by this Mortgage. Mortgagor's obligations under this Section 1.8 shall survive payment in full of the Note and the other Loan Documents and any discharge, release or satisfaction of this Mortgage, any complete or partial foreclosure of this Mortgage and/or the delivery of one or more deeds in lieu of any such foreclosure.

    1.9.   <u>Insurance and Casualty</u>.

      (a)  <u>Casualty Insurance</u>. Mortgagor shall keep the Improvements and Chattels insured for the benefit of Mortgagee for one hundred percent (100%) of full replacement cost in so-called "all-risk" form. The applicable policies shall include (i) coverage against loss or damage by fire, flood, earthquake, underground hazards, collapse and explosion and such other hazards as may be specified at any time by Mortgagee, (ii) replacement cost and agreed amount endorsements or the equivalent thereof (with no reduction for depreciation), an endorsement covering the costs of demolition and the increased costs of construction attributable to the enforcement of laws, building codes and/or ordinances, and (iii) "time element" coverage, which shall ensure payment to Mortgagee of all moneys due Mortgagee under the Loan Documents and "extra expense" (<u>i.e.</u>, soft costs) coverage.

      (b)<u>Other Insurance</u>. Mortgagor shall also maintain (i) policies that provide boiler and machinery comprehensive coverage for all mechanical and electrical equipment at the Premises insuring against breakdown or explosion of such equipment on a replacement cost value basis; such policies shall provide the coverage specified in clause (iii) of the preceding paragraph (a); (ii) business interruption or loss of rental income insurance for a period of not less than one year in connection with all policies of property and boiler and machinery insurance; (iii) commercial general liability insurance (including contractual liability) covering the Premises and Mortgagor's operations in an amount not less than One Million Dollars ($1,000,000) per occurrence and not less than Two Million Dollars ($2,000,000) in the aggregate; (iv) commercial automobile liability insurance with a limit of not less than One Million Dollars ($1,000,000) combined single limit and

endorsed to cover owned, hired and non-owned automobiles; (v) worker's compensation insurance covering all of Mortgagor's employees situated at the Premises in accordance with statutory requirements of the State of New York and including an endorsement for employer's liability coverage; and (vi) umbrella liability insurance in excess of the foregoing liability coverage with a limit of not less than Five Million Dollars ($5,000,000) or such higher limits as Mortgagee may specify. The foregoing commercial general liability and umbrella liability policies shall also contain a so-called "products-completed operations endorsement." If any part of the Premises is at any time used for the sale or dispensing of beer, wine or any other alcoholic beverages, so-called "Dram Shop" or "Liquor Law Liability Insurance" against claims brought by, or liability arising directly or indirectly to, persons or property on account of such sale or dispensing of beer, wine or other alcoholic beverages shall also be furnished (including coverage against loss of means of support), all in such amounts as Mortgagee may specify. To the extent applicable, special coverages must also be furnished for other operations of Mortgagor or any tenants at the Premises, including garage operations, asbestos removal and such other operations as may be designated by Mortgagee from time to time. In addition, if any underground fuel storage tank is situated at the Premises, then Mortgagor shall maintain, in such amounts as Mortgagee may specify, "Environmental Impairment Liability Insurance" covering the cost of clean up and/or removal (on or off the Premises) associated with a spill or a leak emanating from such tank.

(c) No Separate Insurance. Mortgagor shall not procure separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 1.9.

(d) Flood Insurance. If the Mortgaged Property is located in an area that has been, or at any time is, identified by the Secretary of Housing and Urban Development as a flood hazard area, Mortgagor shall keep the Improvements and Chattels insured against loss by flood in such amount as Mortgagee shall require. All proceeds of any such insurance shall be payable to Mortgagee and may be applied as set forth in Section 1.9(h) below.

(e) Policy Requirements. All insurance required or permitted to be maintained pursuant to this Section 1.9 shall (i) be maintained at the sole cost and expense of Mortgagor; (ii) be written in such forms and by such companies as are satisfactory to Mortgagee (each such company, in any event, shall be authorized to do business in the state where the Premises are situated and shall have an Alfred M. Best Company, Inc. rating of "A:X" or higher); (iii) contain the standard New York State Mortgagee Clause or an equivalent satisfactory to Mortgagee or, with respect to any insurance as to which the foregoing shall not be applicable, provide for Mortgagee to be named as an additional insured; (iv) name Mortgagee as the loss payee; (v) include waivers by all insurers of all rights of subrogation against any named or additional insured, the indebtedness secured hereby and the Mortgaged Property; (vi) except as otherwise agreed to in writing by Mortgagee, provide for no deductible in excess of $10,000 per loss; and (vii) provide that no cancellation (including, without limitation, for nonpayment of premiums), reduction in amount or material change in coverage shall be effective until at least thirty days after receipt by Mortgagee of written notice thereof; (viii) provide that no act or omission or negligence of Mortgagor or any other named insured or violation of warranties, declarations or conditions by Mortgagor or any other named insured shall affect or limit the obligation of the insurer to pay the amount of any loss sustained; and (ix) contain such other provisions as Mortgagee may require. Mortgagor shall deliver the original policies of insurance to Mortgagee, but Mortgagee shall under no circumstance be deemed to have knowledge

of the contents of such policies by reason of its custody thereof. Mortgagor shall deliver to Mortgagee new or renewal policies to replace expiring policies at least thirty days before their respective expiration dates. Each such new or renewal policy shall bear a notation by the insurer or its authorized agent evidencing payment of the required premium. If any policy shall be canceled by the insurer, become void by reason of any act(s) or omission(s) of Mortgagor or any other person or entity or by reason of the impairment of the capital of the insurer thereunder, or if for any reason in Mortgagee's sole discretion said policy shall become unsatisfactory to Mortgagee, Mortgagor shall immediately procure new or additional insurance satisfactory to Mortgagee. Mortgagee's approval of any insurance procured by Mortgagor shall not be construed, or relied upon by Mortgagor, as a representation of the solvency of any insurer or the sufficiency of any amount of insurance. If Mortgagor shall fail in a timely manner either to keep in force any insurance required under this Mortgage or to deliver to Mortgagee any policy required hereunder, Mortgagee shall have the right, but shall not be obligated, to remedy any such failure by the expenditure of moneys or otherwise, in which event the provisions of Section 1.10 below shall be applicable.

(f) <u>Unearned Premiums</u>. Mortgagor hereby irrevocably and unconditionally assigns to Mortgagee the unearned premiums on all insurance policies furnished hereunder and consents to the cancellation of such policies (and the refund of all unearned premiums to Mortgagee) if Mortgagee purchases the Mortgaged Property at foreclosure sale. Any such unearned premiums shall be applied against sums due to Mortgagee under the Note or this Mortgage.

(g)<u>Effect of Foreclosure</u>. Upon a foreclosure of this Mortgage or other transfer of title to the Mortgaged Property in full or partial payment of the Loan, all right, title, and interest of Mortgagor in and to any insurance policies then in force shall pass to the purchaser or grantee or other person designated by the holder of the Note, and Mortgagor hereby irrevocably and unconditionally appoints Mortgagee as Mortgagor's true and lawful attorney-in-fact, coupled with an interest, in Mortgagor's name and stead, with full power of substitution, to assign and transfer all such policies and the proceeds thereof to such purchaser, grantee or other person.

(h)<u>Casualty; Application of Insurance Proceeds</u>. Mortgagor shall give Mortgagee immediate notice of any damage or destruction affecting the Mortgaged Property. Promptly thereafter Mortgagor shall make proof of loss and diligently undertake (if necessary, by means of legal proceedings) to obtain payment of the proceeds under applicable insurance policies, except that Mortgagee shall have the right to join Mortgagor in adjusting any loss in excess of $25,000. All insurance proceeds shall be paid directly to Mortgagee, and all insurance companies are hereby irrevocably and unconditionally directed by Mortgagor to make payment for any covered loss to Mortgagee. Whether or not repairs or restoration shall have been made, Mortgagee shall have the right to apply such proceeds (i) first to reimbursing Mortgagee for all costs incurred by it in the collection of such proceeds, (ii) second to the prepayment of the principal of the Note, in whole or in part (to installments in inverse order of maturity), all accrued and unpaid interest thereon and Prepayment Charge, and (iii) third to the payment of such other obligations and/or liabilities of Mortgagor under the Loan Documents as Mortgagee shall determine. The balance, if any, of such proceeds shall be paid to whoever shall be legally entitled to the same. Notwithstanding the foregoing, with respect to any loss up to $25,000, Mortgagor shall be entitled to retain the insurance proceeds, provided that Mortgagor shall hold such proceeds as a trust fund to be applied solely to the

cost of restoring the Mortgaged Property (with the balance, if any, of such proceeds to be paid to whoever shall be legally entitled to the same).

(i)    Application of Insurance Proceeds. Notwithstanding anything to the contrary set forth in the preceding Section 1.9(h), if the Mortgaged Property is damaged or destroyed and Mortgagee determines that all of the conditions specified in this Section 1.9(i) have been satisfied, then Mortgagee shall apply the proceeds of insurance (i) first to reimbursing itself for all costs incurred by it in the collection of such proceeds and (ii) second to reimbursing Mortgagor for such actual costs as shall have been incurred by Mortgagor in restoring the Mortgaged Property and shall be approved by Mortgagee. Insurance proceeds shall be applied to such restoration solely if (A) Mortgagee determines that: (i) the Mortgaged Property is capable of being suitably restored in accordance with applicable Requirements to the value, condition, character and general utility existing prior to such damage or destruction, and, in any event, to a value at least 1.35 times the amount then outstanding under the Note; (ii) sufficient funds are unconditionally available (from proceeds of insurance and/or from funds of Mortgagor) to enable Mortgagor promptly to commence, and thereafter diligently to prosecute to completion, such restoration; (iii) Mortgagor is not in default or in breach of any obligations under any Loan Document, no uncured Event of Default exists under any Loan Document and no facts or circumstances exist that would constitute an Event of Default with the passage of time or the giving of notice or both; and (iv) neither the validity, enforceability nor priority of the lien of this Mortgage shall be adversely affected; (B) Mortgagor has entered into a written agreement, satisfactory in form and substance to Mortgagee, containing such conditions to disbursements as are employed at the time by Mortgagee for construction loans; (C) Mortgagor has delivered to Mortgagee such security as Mortgagee might have reasonably required to assure completion of restoration in accordance with the standards specified above; and (D) Mortgagor has complied with such further reasonable requirements as Mortgagee might have specified.

1.10.    Advances, Access, Etc., by Mortgagee.    If Mortgagor fails fully, faithfully or punctually to perform or comply with any obligation set forth in or to be performed or complied with pursuant to any Loan Document, then Mortgagee shall have the right, but shall not be obligated, to perform or comply with the same and make such advances therefor as, in Mortgagee's opinion, may be necessary or appropriate, all for the account and at the expense of Mortgagor. To the extent of all sums so advanced (including, without limitation, attorneys' fees and disbursements), Mortgagee shall have a lien upon the Mortgaged Property which shall be secured by this Mortgage. Mortgagor shall repay on demand all sums so advanced on Mortgagor's behalf with interest computed at the Involuntary Rate on each such sum from the date advanced by Mortgagee until the date Mortgagee has received repayment thereof. Mortgagee's exercise of its rights under this Section 1.10 shall not be deemed to cure any circumstance that would otherwise constitute an Event of Default or to impair any of Mortgagee's other rights or remedies with respect thereto, and the obligations of Mortgagor under this Section 1.10 shall pertain irrespective of whether the failure of Mortgagor referred to in the initial sentence of this Section results in the existence of an Event of Default. Mortgagor shall permit Mortgagee and its agents and representatives to enter the Mortgaged Property at all reasonable times for the purposes of (a) inspecting the same, (b) determining whether Mortgagor is in compliance with all of Mortgagor's obligations under this Mortgage, (c) performing or complying with, in Mortgagee's sole election, any one or more of Mortgagor's obligations under the Loan Documents and (d) undertaking such other acts as are

consistent with the provisions of this Mortgage. No such entry shall make Mortgagee a "mortgagee in possession," nor shall Mortgagee be liable for inconvenience, annoyance, disturbance, loss of business or other damage arising out of, or in connection with, actions taken by Mortgagee in good faith under this Section 1.10.

1.11.  <u>Escrow Requirements</u>.

Notwithstanding anything to the contrary set forth in any Loan Document, Mortgagee shall have the right at any time and from time to time to require Mortgagor to pay to Mortgagee, at the time of each payment of a monthly installment of interest or principal under the Note, a sum equal to one-twelfth of the estimated annual amount of all real estate taxes, water and sewer charges and assessments, and, at Mortgagee's further option, a sum equal to one-twelfth of the annual amount of any other recurring charges with respect to the Mortgaged Property (such as insurance premiums), so that at least one month before the due date of each such charge Mortgagee shall hold sufficient funds to pay each such charge in full.  The determination of the amount so payable and of the fractional part thereof to be deposited with Mortgagee, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Mortgagee.  Such amounts shall be held by Mortgagee, but not in trust and without interest, and applied to the payment of such charges in such order or priority as Mortgagee shall determine, on or before the respective dates on which the same or any of them would become delinquent.  If at any time before the date payment of any such charge is due, Mortgagee determines that the amounts then on deposit therefor shall be insufficient for the payment of such obligation in full, then Mortgagor, within ten days after demand, shall deposit the amount of the deficiency with Mortgagee.  This Section 1.11 does not affect any right or remedy of Mortgagee under any provisions of this Mortgage or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the indebtedness secured by this Mortgage, as more fully described in Section 1.10.  Upon the occurrence of an Event of Default, Mortgagee may, at its option and without notice to Mortgagor, apply any funds held pursuant to this Section in payment of any of the obligations described above or to any unpaid principal or interest under the Note in such order as Mortgagee may determine.

1.12.  <u>Financial Reporting</u>.

(a)<u>Mortgagor's Books and Records</u>.  Mortgagor shall keep proper books and records of account in a manner satisfactory to Mortgagee and in accordance with generally accepted accounting principles (or, with Mortgagee's consent, not to be unreasonably withheld, proper cash basis accounting practices) consistently applied and shall enter in such books and records a full, true and accurate record of the earnings and expenses of the Mortgaged Property.  Mortgagor shall permit Mortgagee, by its agents, accountants and attorneys, to visit and inspect the Mortgaged Property and examine and copy Mortgagor's books and records of account, and supporting vouchers, data and other documentation and to discuss Mortgagor's affairs, finances and accounts with Mortgagor or such of its officers, partners, members or other principals as Mortgagee may desire, at such reasonable times as Mortgagee may request.

(b)<u>Financial Statements</u>. Mortgagor shall deliver to Mortgagee, and shall cause the Principals of Mortgagor and Guarantor to deliver to Mortgagee, within 90 days after the close of each of their respective fiscal year(s), a balance sheet and statement of income and expense for such

fiscal year (which, in the case of Mortgagor, shall separately set forth the earnings and expenses of the Mortgaged Property) and a current rent roll for the Mortgaged Property. In addition, Mortgagor, with reasonable promptness, shall provide Mortgagee with such other information with respect to Mortgagor, the Principals of Mortgagor, Guarantor or the Mortgaged Property as Mortgagee may reasonably request from time to time. All financial statements shall include a complete comparison with the figures for the preceding year, shall be prepared in accordance with the accounting practices described in Section 1.12(a), and shall be certified by the person or entity that is the subject of the financial statements. Mortgagor shall retain all books and records of account, financial statements and other data and documentation which relate to the subject matter of this Section 1.12 for at least seven years after the expiration of the year to which each such item pertains.

(c) Certificate to Accompany Financial Statements. Mortgagor's financial statements shall be accompanied by the certificate of an officer, general partner, managing member or other Principal of Mortgagor (or of Mortgagor, if Mortgagor is an individual), dated within five days of the delivery of such statements to Mortgagee, stating that the signatory knows of no Event of Default, nor of any event that after notice or lapse of time or both would constitute an Event of Default, that has occurred and is continuing, or, if any such default or Event of Default has occurred and is continuing, specifying the nature and period of existence thereof and what action Mortgagor has taken or proposes to take with respect thereto, and, except as otherwise specified, stating that Mortgagor has fulfilled all of Mortgagor's obligations under this Mortgage that are required to be fulfilled on or before the date of such certificate.

(d) Certification of Balance. Mortgagor, within five (5) days after a request made in person or within ten days after a request made by mail, shall sign, acknowledge and furnish to Mortgagee a statement certifying the principal amount then outstanding on the Note, confirming that no offsets, claims, counterclaims, or defenses exist against the Mortgage indebtedness, and containing such other matters as Mortgagee shall reasonably require.

1.13.   Maintenance and Operation of Mortgaged Property. Mortgagor shall not commit any waste on the Mortgaged Property or make any change in the use of the Mortgaged Property that would in Mortgagee's judgment in any way increase the likelihood of fire or other hazard, increase any insurance rates for the Mortgaged Property, or reduce the value or utility of the Mortgaged Property. Mortgagor shall, at all times, maintain the Mortgaged Property in good and efficient operating order and condition and shall promptly make, from time to time, all necessary or desirable repairs, renewals, replacements, additions and improvements thereto, whether structural or nonstructural, exterior or interior, ordinary or extraordinary, foreseen or unforeseen. Mortgagor shall not alter, demolish, excavate or improve the Mortgaged Property without the express written consent of the Mortgagor. Mortgagor shall promptly comply with all requirements necessary to preserve and extend any and all rights, licenses, permits, privileges, franchises and concessions that apply to the Mortgaged Property or have been (or subsequently are) granted to or contracted for by Mortgagor in connection with any existing or proposed use of the Mortgaged Property. The Improvements shall not be removed, demolished or substantially altered without the prior written consent of Mortgagee. No Chattels shall be removed without Mortgagee's prior written consent, unless Mortgagor immediately makes appropriate replacements free of superior title, liens and claims and of a quality and value at least equal to that of the Chattels so removed. Mortgagor shall

cause all lessees and other persons and entities occupying the Mortgaged Property to comply with the obligations imposed upon Mortgagor in this Section 1.13.

1.14.   Condemnation.  Mortgagor, immediately upon obtaining knowledge of the institution of any proceeding for either (a) the condemnation of the Mortgaged Property or any portion thereof, or (b) the change of grade or widening of streets affecting or abutting the Premises shall notify Mortgagee of the pendency of such proceeding. Mortgagee may participate in any such proceeding, in its own name and/or as Mortgagor's attorney-in-fact, as hereinbelow provided (with Mortgagee being represented in either case by attorneys selected by Mortgagee, whose fees and expenses Mortgagor shall pay upon demand), and, upon Mortgagee's request, Mortgagor shall deliver to Mortgagee instruments which shall facilitate such participation. Mortgagor hereby irrevocably and unconditionally (x) assigns to Mortgagee all of Mortgagor's right, title and interest in and to any award or other compensation payable pursuant to or in connection with any such proceeding and agrees to pay (and directs all Governmental Authorities to pay) to Mortgagee any such award or other compensation, and (y) appoints Mortgagee as Mortgagor's true and lawful attorney-in-fact, coupled with an interest, in Mortgagor's name and stead, with full power of substitution to commence, appear in and prosecute any such proceeding, to settle or compromise any claim in connection therewith, to collect and receive such award or other compensation and to take such other actions as Mortgagee may determine are necessary or desirable. Mortgagee shall be under no obligation to question the amount of any such award or other compensation and may accept the same in the amount in which the same shall be paid.  The proceeds of any award or other compensation so received (including any award for change of grade or widening of streets affecting or abutting the Premises) shall be applied (i) first to reimbursing Mortgagee for all costs incurred by it in any such proceeding, (ii) second to the prepayment of the principal of the Note, in whole or in part (to installments in inverse order of maturity), all accrued and unpaid interest thereon and Prepayment Charge, and (iii) third to the payment of such other obligations and/or liabilities of Mortgagor under the Loan Documents as Mortgagee shall determine. The balance, if any, of such proceeds shall be payable to whoever may be legally entitled to the same.  Unless and until Mortgagee has actually received moneys with respect to the subject matter of this Section 1.14 and applied such moneys to reduction of the indebtedness secured by this Mortgage, Mortgagor shall continue to make all payments provided for in the Loan Documents strictly in accordance with the provisions thereof.

1.15.   Leasing of Mortgaged Property.

(a) Existing Leases.  Mortgagor represents and warrants to Mortgagee that, as to each existing Lease, (i) the Lease has been duly executed by the lessor and lessee thereunder, is in full force and effect and is valid, binding and enforceable against each of said parties in accordance with its terms; (ii) the copy of the Lease heretofore delivered to Mortgagee by Mortgagor is a true, correct and complete copy of the entire Lease; (iii) neither the lessor nor the lessee has failed to comply with any obligation imposed upon such party thereunder; (iv) neither the Lease nor any Rents payable thereunder have heretofore been sold, assigned, transferred or set over by any instrument now in force, nor, unless indicated to the contrary in the Lease Assignment, is the Lease other than a direct lease from Mortgagor to a lessee; (v) Mortgagor is entitled to receive and enjoy all Rents payable under the Lease; (vi) no installment of Rents has been paid more than thirty days prior to the due date for such installment; (vii) the lessee does not have and has not claimed any defense,

-16-

abatement, deduction, offset, claim or counterclaim affecting the payment of Rents or compliance with the lessee's other obligations thereunder, and all Rents provided for in the Lease are currently being collected free thereof and without any violation of any law or other governmental regulation or requirement; (viii) the Lease contains no option to buy or right of first refusal with respect to an offer to sell the Mortgaged Property or any part thereof; (ix) Mortgagor has the sole and unconditional right and power to sell, assign, transfer and set over the Lease to Mortgagee and to confer upon Mortgagee the rights, interests, power and authority herein granted and conferred; and (x) the Lease is, by its express terms, unconditionally subject and subordinate to the lien of this Mortgage.

(b) Foreign Governments: Leases. The Mortgagor covenants and agrees not to lease the whole or any part of the mortgaged premises to the United States of America, any state, any political subdivision thereof or any of their respective agencies, or to any person or entity having diplomatic or sovereign immunity, without the prior written consent of the Mortgagee. With regard to future tenants or purchasers of apartments in the Mortgaged Property, if any, Mortgagor covenants and agrees that no accredited representative or employee of a foreign government or international organization shall become a tenant under a lease or proprietary lease unless the appropriate representative of such foreign government or international organization shall, in writing to the lessor or proprietary landlord as the case may be, either expressly waives diplomatic immunity or certifies that such employee or representative would not enjoy diplomatic immunity with regard to any action brought under the lease or proprietary lease and the person so certifying states that he is authorized to do so, except to the extent that the lessor or proprietary landlord as the case may be, is required by law to lease to such a person. The Mortgagor will not, without the prior written consent of the Mortgagee, assign the rents or any part thereof, from said premises; nor consent to the cancellation or surrender of, or accept prepayment of rents under, any lease now or hereafter covering said premises or any part thereof nor modify any such lease so as to shorten the term, decrease the rent, accelerate the payment of rent or change the terms of any renewal option, and any such purported assignment, cancellation, surrender, prepayment or modification made without the written consent of the Mortgagee shall be void as against the Mortgagee. The provisions of the preceding sentence shall be enforceable as provided in Section 291-f of the Real Property Law with respect to leases covered by said section; as to leases not covered by said section, the Mortgagee shall be entitled to enforce the foregoing in any manner permitted by law or equity. The Mortgagor will upon demand of the Mortgagee enter into an agreement with the Mortgagee pursuant to said Section 291-f with respect to any lease hereafter executed covering said premises or any part thereof, and the Mortgagor hereby appoints the Mortgagee attorney-in-fact of the Mortgagor to execute and deliver any such agreement on behalf of the Mortgagor and to deliver to the tenant to whose lease such agreement relates the written notice referred to in said Section 291-f. The Mortgagor will perform and comply with the terms of all leases covering said premises or any part thereof on its part to be performed or complied with. If any provision hereof is inconsistent with any separate assignment of leases and/or rents delivered to Mortgagee by Mortgagor, the provisions of such separate assignments shall control. If said premises have been converted with the consent of Mortgagee to cooperative ownership and in connection with the sale of individual apartment units, the Mortgagor may join in the cancellation of the proprietary lease affecting such apartment unit in order to replace same with a proprietary lease to an approved transferee.